488 F.2d 1252
 159 U.S.App.D.C. 352
 UNITED STATES SERVICEMEN'S FUND et al., Appellants,
v.
James O. EASTLAND et al.
PROGRESSIVE LABOR PARTY et al.
v.
COMMITTEE ON INTERNAL SECURITY OF the UNITED STATES HOUSE OF
REPRESENTATIVES et al., Appellants.
NATIONAL PEACE ACTION COALITION et al.
v.
COMMITTEE ON INTERNAL SECURITY OF the UNITED STATES HOUSE OF
REPRESENTATIVES et al., Appellants.
PEOPLES COALITION FOR PEACE AND JUSTICE
v.
COMMITTEE ON INTERNAL SECURITY OF the UNITED STATES HOUSE OF
REPRESENTATIVES et al., Appellants.
 Nos. 24279, 24412, 71-2034, 71-1609, 71-1693 and 71-1717.
 United States Court of Appeals,
District of Columbia Circuit.
Argued Jan. 15, 1973.
Decided Aug. 30, 1973.
As Amended Oct. 5, 1973.
Rehearing Denied Jan. 23, 1974.
 
 Nancy Stearns, and Jeremiah S. Gutman, New York City, with whom Philip J. Hirschkop, Alexandria, Va., was on the brief, for appellants in Nos. 24279, 24412 and 71-2034.
 Robert L. Keuch, Atty., Dept. of Justice, with whom Richard S. Stolker, Atty., Dept. of Justice, was on the brief, for appellees in Nos. 24279, 24412 and 71-2034. Benjamin C. Flannagan, Atty., Dept. of Justice, also entered an appearance for appellee in No. 24279.
 Robert L. Keuch, Atty., Dept. of Justice, with whom Garvin Lee Oliver, Atty., Dept. of Justice, was on the brief, for appellants in Nos. 71-1609, 71-1693, and 71-1717. Benjamin C. Flannagan, Atty., Dept. of Justice, also entered an appearance for appellants in Nos. 71-1609, 71-1693 and 71-1717.
 Burt Neuborne, New York City, of the Court of Appeals of New York, with whom Jeremiah S. Gutman, New York City, and Hope Eastman, Washington, D. C., were on the brief, for appellees in Nos. 71-1609, 71-1693, and 71-1717.
 Before BAZELON, Chief Judge, TUTTLE,* Senior Circuit Judge for the Fifth Circuit, and MacKINNON, Circuit Judge.
 TUTTLE, Senior Circuit Judge:
 
 
 1
 This case, combined for argument and consideration on appeal with cases numbered 71-1609, 71-1693 and 71-1717, presents the court with the task of deciding a fundamental constitutional question of grave import to which the Supreme Court has not yet given an explicit answer. The question is: Have the courts of the United States the power to interfere with the subpoena power as exercised by committees of the United States Senate and House of Representatives when the exercise of such power threatens a deprivation of First Amendment rights of freedom of association which can be vindicated in no way other than by court decree?
 
 
 2
 This difficult question comes to this Court by appeal from denial of an injunction by the trial court. It is an action by United States Servicemen's Fund, et al., v. Eastland, et al., chairman, members and counsel for the Sub-Committee on Internal Security of the Committee of the Judiciary of the United States Senate and the Chemical Bank New York Trust Company. The history of the litigation and its origins, so far as necessary to our consideration of the issues on appeal follows:
 
 
 3
 On May 28, 1970, there issued over the signature of Honorable James O. Eastland, Chairman, Committee on the Judiciary and Sub-Committee on Internal Security of the United States Senate a subpoena directed to Chemical Bank in New York City commanding it to bring to the Sub-Committee on Internal Security on June 4, 1970, at the committee room, 2300 New Senate Office Building, Washington, D. C., at 10 o'clock a. m.
 
 
 4
 "pursuant to S.Res. 366, 81st Congress-2d, as amended and extended, and S.Res. 341, agreed to February 16, 1970, any and all records pertaining to or involving the account or accounts of the United States Servicemen's Fund. Such records to comprehend papers, correspondence, statements, checks, deposit slips and supporting documentation, or microfilm thereof within your control or custody or within your means to produce."
 
 
 5
 On or about June 1, 1970, a complaint was filed by USSF against the stated defendants and an application for temporary restraining order prohibiting the execution of the subpoena was filed with the United States District Court for the District of Columbia. The plaintiffs asserted that they were a non-profit, tax-exempt membership corporation to further the welfare of persons who have served or are presently serving in the military.[1]
 
 
 6
 The challenge to the validity of the subpoena included an attack on the overbreadth of Resolutions 366 and 341, the vagueness and ambiguity of such resolutions and that the subpoena issued under the resolutions
 
 
 7
 "violates plaintiffs' rights under the United States Constitution and particular their rights of privacy and their rights of freedom of speech, freedom of press, freedom of association and freedom from unreasonable search and seizure as guaranteed by the First, Fourth, Fifth, Ninth and Tenth Amendments."
 
 
 8
 The petition also alleged on information and belief that the subpoena was issued against the defendant, Chemical Bank New York Trust Company, rather than directly against the plaintiffs in order to deprive plaintiffs of their rights to protect their private records, such as the sources of their contributions, as they would be entitled to do if the subpoenas had been issued against them directly. It further alleged
 
 
 9
 "the financial support of USSF, which permits it to continue its activities, in furtherance of the welfare of military personnel, is obtained exclusively through contributions of private individuals and foundations. Plaintiffs believe that if the Chemical Bank is forced, under a threat of contempt of Congress, to comply with the aforesaid subpoena and provide a sweeping array of documents demanded by the Sub-Committee, much of that financial support will be withdrawn and USSF will be unable to continue its constitutionally protected activities." The petition finally alleged
 
 
 10
 "unless the enforcement and operation of the subpoena and the resolutions pursuant to which it was authorized are restrained by this court, immediate and irreparable harm will be done to the plaintiffs and to the entire nation by the curbing of freedom of the press and of dissent."
 
 
 11
 The complaint prayed for a permanent injunction restraining the bank from complying with the subpoena by in any way "disclosing, revealing or delivering any records, papers, correspondence, statements, checks, deposit slips, supporting documents or microfilm" to the committee; and restraining defendant Sub-Committee members and staff counsel from seeking to enforce the said subpoena by use of the power of contempt of Congress or any other means. It also sought a declaratory judgment holding that the aforesaid subpoena is void and illegal under the United States Constitution and that Senate Resolutions 366 and 341 are void and illegal under the United States Constitution.
 
 
 12
 The case having come on for hearing on plaintiffs' application for temporary restraining order the trial court stated
 
 
 13
 "upon consideration of the application and argument of counsel in chambers and it appearing to the court that this court lacks subject matter jurisdiction, the plaintiffs lack standing to sue, and that plaintiffs failed to demonstrate probability of success on the merits, it is by the court this first day of June, 1970, ORDERED that plaintiffs' application for a temporary restraining order be, and the same is, hereby denied."
 
 
 14
 Thereafter, application was then made to this Court for a stay in the enforcement of the subpoenas and this Court, Judge MacKinnon dissenting, entered the following order:
 
 
 15
 "This court accords deference to the committees of Congress, a coordinate branch of the Government, and to their authority to conduct investigations and to subpoena witnesses and records in connection with their investigations.
 
 
 16
 It appears, however, that serious constitutional questions are presented by this litigation which require more time than is presently available for proper consideration. See Stamler v. Willis, 7 Cir., 415 F.2d 1365 (1969). The Second Circuit has, in similar circumstances, involving the same appellees, issued a temporary restraining order in order to assure appropriate consideration by the federal courts in the District of Columbia. Liberation News Service v. Eastland, 2 Cir., F.2d [1379] (No. 34,688, decided May 7, 1970).
 
 
 17
 In denying temporary relief, the District Court assumed the court entirely lacked jurisdiction. This assumption is doubtful indeed in view of the fact that parties defendant include the cognizant counsel of a committee and the private party to whom plaintiffs have entrusted information. Stamler v. Willis, supra; Hearst v. Black, 66 App.D.C. 313, 87 F.2d 68 (1936).
 
 
 18
 It appears to the Court that the issues involved, as to the merits of the case, are of such significance that they require at least the kind of consideration and deliberation that would be provided by the procedure of a hearing on an application for injunction, as contrasted with a mere temporary restraining order.
 
 
 19
 The decisive element in our action to grant a stay is like that which moved the Second Circuit, because unless a stay is granted this case will be mooted, and there is likelihood, that irreparable harm will be suffered by appellants, at 10:00 a. m. this morning.
 
 
 20
 It is ORDERED by the court that the emergency stay requested by appellants be granted until the District Court has an opportunity fully to consider and to act on this matter, and it is
 
 
 21
 FURTHER ORDERED by the court that consideration of this case be expedited by the District Court.
 
 
 22
 Judge MacKinnon is of the opinion that the question is not free from doubt but would deny the stay on the record made before the trial court on the grounds that the subpoena was issued for a valid legislative purpose and that the balancing of the legislative power of Congress, including the ancillary power to investigate to determine what legislation may be necessary, against defendants' claimed First Amendment rights, leads to the conclusion that the balance prevails in favor of the governmental interest and that plaintiffs will not prevail on the merits. Barenblatt v. United States, 360 U.S. 109 [79 S.Ct. 1081, 3 L.Ed.2d 1115] (1959)."
 
 
 23
 Responding to that part of this Court's order that consideration of this case be expedited by the district court, the trial court held a hearing on the motion for preliminary injunction promptly thereafter and entered its order denying the injunction on June 30, 1970. By the same order the trial court denied the defendant's motion to dismiss the complaint.
 
 
 24
 Thereafter an order of this Court stayed enforcement of the subpoena until final disposition of the case on appeal, but recommended that in the meantime the case go to final judgment in the district court. For convenient reference, this order, together with the dissent, is here set out:
 
 No. 24,412
 
 25
 United States Servicemen's Fund, et al.
 
 
 26
 v.
 
 
 27
 James O. Eastland, et al.
 
 
 28
 Before: Wright, Leventhal, and MacKinnon, Circuit Judges, in Chambers.
 
 ORDER
 
 29
 "This court accords deference to the committees of Congress, a coordinate branch of the Government, and to their authority to conduct investigations and to subpoena witnesses and records in connection with their investigations.
 
 
 30
 The stay granted by the Court on July 2, 1970, requires expeditious disposition of this case. Since the calendar for the September sitting of this Court has already been prepared and assigned, the case is hereby assigned to the October sitting. This will obviate the delay which would have been involved if the Clerk had followed the standard practice of including in the calendaring for the October sitting only those cases for which briefs had been filed prior to the date of preparation of the calendar.
 
 
 31
 It appears to the Court that determination of the appeal may well turn on its assessment of the merits. Stamler v. Willis, 415 F.2d 1365 (7th Cir., 1969), cert. denied sub nom. Ichord v. Stamler, [399 U.S. 929, 90 S.Ct. 2231, 26 L.Ed.2d 796] 38 U.S.L. W. 3522 (June 30, 1970). It would therefore be in the interest of justice if the case could proceed expeditiously in the District Court on the merits. The final judgment of the District Court is likely to be appealed whichever way the court rules. By expedition of that appeal and consolidation with the instant appeal, it may be possible both to proceed with expedition and to ensure that a question of importance is determined with the best available perspective, both as to underlying evidence and the appraisal thereof by the District Judge.
 
 Per Curiam
 
 32
 MacKinnon, Circuit Judge: I would refuse to grant a further stay and would affirm the District Court on the ground principally that appellants are not likely to succeed on the merits. For this reason, I also conclude that mooting the case will not cause them irreparable injury. Appellants are seeking to establish a privileged status not provided for by the law. Furthermore, the names of contributors to such activities is a matter of vital concern to Congress; and within its power to investigate, and it should not be further frustrated in its proper effort to get on with its business of legislating with respect to the evils created thereby, if investigation confirms same."
 
 
 33
 Upon motion of the defendants who are United States Senators the trial court, although having theretofore overruled a motion to dismiss, ordered that the defendants who were Senators should be dropped as parties defendant, the court stating
 
 
 34
 "it appearing on the record that said defendants are United States Senators, the court concludes that said defendants are personally immune from suit. Dombrowski v. Eastland, 387 U.S. 82 [87 S.Ct. 1425, 18 L.Ed.2d 577] (1967)."
 
 
 35
 Thereafter, on February 23, 1971, the trial court held a hearing on the motion for permanent injunction and on plaintiffs' motion for compelling the testimony of defendant Sourwine, counsel for the committee. The court denied both the injunction and the application for taking of the committee counsel's testimony by its order of October 21, 1971.
 
 
 36
 This final order was then appealed and the appeal was combined with the pending appeal from the denial of preliminary injunction. The appellants here, the plaintiffs below, complain of (1) the denial of a preliminary injunction, (2) the dismissal of the members of the Sub-Committee on Internal Security as parties defendant, (3) the denial of an order compelling the testimony of defendant Sourwine, and (4) the denial of a permanent injunction.
 
 
 37
 The appellees, represented by the Department of Justice, state their contention in several "issues" which may be compressed into the following: (1) Do plaintiffs have standing to enjoin the execution of this subpoena when issued to a third party bank which has exclusive possession, custody and control of such records; (2) Do plaintiffs in the exercise of their First Amendment rights to association have standing to enjoin "an investigation being conducted by a congressional sub-committee";[2] (3) Does this complaint seeking relief against United States Senators in their official capacity and against staff counsel state a case or controversy within the meaning of Article III, Section 2 of the Constitution; (4) Assuming jurisdiction, which is challenged, should a federal court, pursuant to the doctrine of separation of powers, and as a matter of judicial restraint, abstain from exercising that jurisdiction "by enjoining the execution of a validly authorized subpoena duces tecum" under the facts of this case; (5) Is the Senate Resolution authorizing this Sub-Committee's investigation unconstitutionally vague or overbroad; (6) May a federal court refuse to enjoin a congressional investigation where plaintiffs failed to demonstrate a threat of irreparable injury sufficient to outweigh the legislative interest in conducting that investigation; (7) May a federal court refuse to compel an attorney employed by the legislative branch of the government to testify as to matters within the possession and control of the Congress which relate to the underlying basis for a congressional investigation and as to which the Congress has asserted its privilege of legislative immunity.
 
 
 38
 The defendants, of course, assert that the trial court erred in not dismissing the complaint. In other words, they take the position that, even though all of the allegations in the complaint were to be taken as true, the United States District Court did not have, or should not exercise, jurisdiction because of what must be construed to be an assertion of absolute legislative immunity so long as the actions engaged in by the members of the committee and its counsel occurred during the course of valid legislative investigatory proceeding.
 
 
 39
 Before dealing with the several specific grounds upon which the parties rely we think it appropriate to make plain a fundamental principle which this Court has uniformly recognized as of critical significance in cases such as this, in which the courts are asked to intervene to prevent an alleged deprivation of the complaining parties' constitutional rights by actions undertaken by one of the Houses of the United States Congress or by a committee or sub-committee thereof. This principle was stated in Hutcheson v. United States, 369 U.S. 599, 622, 82 S.Ct. 1005, 1017, 8 L.Ed.2d 137:
 
 
 40
 "In conclusion, it is appropriate to observe that just as the Constitution forbids the Congress to enter fields reserved to the Executive and Judiciary, it imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress' exercise of its legitimate powers."
 
 
 41
 The principle is restated by this court in Ansara v. Eastland, 143 U.S.App.D.C. 29, 442 F.2d 751 (1971) where, at page 753, this Court said
 
 
 42
 "First, the plaintiffs seek relief that would precede and seek to relate to the conduct of a future legislative hearing. The courts avoid use of extraordinary remedies that involve 'needless friction' with a coordinate branch of the government."
 
 
 43
 Citing Railroad Commission v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Davis v. Ichord, 143 U.S.App.D.C. 183, 442 F.2d 1207 (1970). More recently in Sanders v. McClellan, 150 U.S.App.D.C. 58, 463 F.2d 894 (1972) at page 902 this Court said
 
 
 44
 "the judiciary has the duty 'of not lightly interfering with Congress' exercise of its legitimate powers.' Hutcheson v. United States, 369 U.S. at 622, 82 S.Ct. at 1017. We recently discussed this duty at some length in Ansara v. Eastland, supra."
 
 
 45
 This fundamental doctrine has resulted in many courts staying their hand when equitable relief was sought by plaintiffs who alleged that pending or threatened actions by committees of Congress would result in a violation of their constitutional rights (most frequently First Amendment rights). See, in addition to the cases cited, Cole v. McClellan, 142 U.S.App.D.C. 24, 439 F. 2d 534 (1970).
 
 
 46
 Were the present case cast in the mold of those in which this Court has declined to grant equitable relief to prevent threatened congressional action which assertedly would be a deprivation of the plaintiffs' First Amendment rights, we would, of course, be bound by these decisions and we would, moreover, agree that the basic principle which stayed the hand of the court was one which may be properly invoked in every case in which full relief can be granted to the complaining party in some manner other than through the equitable powers of the court. Concluding, as we do, that this case differs in fact from those which have been discussed in that none of the means by which the plaintiffs' constitutional rights can be vindicated, which existed in all of the previous cases, are here present, we are compelled to face the stark issue: Has the court the power, either by injunction or declaratory judgment, to stay the issuance, service on, or enforcement against, a third party of a subpoena authorized by a congressional committee (whether constitutionally valid or not) when a failure to do so would in and of itself result in a serious deprivation of the right of free speech and assembly guaranteed by the First Amendment?
 
 
 47
 The critically important factual posture of this case which distinguishes it from those in which this court has heretofore denied injunctive relief is apparent. The importance of the distinction is clearly indicated in Sanders v. McClellan, supra. In that case the plaintiff sought to have the district court enjoin the enforcement of a subpoena duces tecum issued to him. The basis for the relief sought was that a compliance with the subpoena by Sanders would result in publication to the world of the names of certain writers for his magazine, which forced involuntary disclosure was claimed by him to be prohibited by the First Amendment. The Court made a painstaking analysis of the competing rights of the Congress to legislate, including the right to conduct committee investigations relevant to the legislative purpose, and the right to freedom of association and of the press which the Court held to be a protected right.
 
 
 48
 In Sanders we recognized that the restraint on the courts, vis a vis the legislative branch, prohibits the court from intervening "prematurely or unnecessarily." The Court clearly implied that the restraint on the courts was not absolute any more than was the First Amendment right absolute. We recognized that the competing interests in the Sanders case could be harmonized because Sanders could test the validity of his claim to freedom from interference with his First Amendment rights by simply refusing to honor the subpoena; by then undertaking to convince the committee of the rightness of his constitutional stand; then, if unsuccessful, appealing to the Senate, which, in the end must vote a contempt citation; or, still being unsuccessful, seek to convince the executive (the attorney-general's representative) not to prosecute; or, ultimately, if still unsuccessful, and, if tried, stand on his constitutional rights in the trial court and thereafter on appeal.
 
 
 49
 This court in Ansara, supra, carefully explained its denial of an injunction pending appeal. In a case in which the subpoenas duces tecum were served directly on the persons claiming their First Amendment rights the Court decided that it should not create "needless friction" by interfering with the committee's action when Ansara, et al., could accomplish the same result by contesting the subpoena and subjecting themselves to possible contempt proceedings. The court said:
 
 
 50
 ". . . we first note that the plaintiffs will have an opportunity to present their constitutional objections to the Subcommittee. Hence the case is to be distinguished, as Government counsel points out, from one where plaintiffs were not subpoenaed and would have no way to claim their constitutional protections at the time of committee's questioning."
 
 
 51
 In both of these cases there was strongly implicit the inference that but for the other means available to the plaintiffs to prevent the loss of their First Amendment rights the Court would, of necessity, have viewed the two cases quite differently. Not only is this implicit from the Court's statement, quoted above, but it appears from the language of the Court in Ansara that government counsel also sought to point out the distinguishing characteristics when the Court had before it a case in which a refusal to intervene before execution of the subpoenae would not of itself amount to a denial of the plaintiffs' rights.
 
 
 52
 Here, in this case, we have the case which is distinguished by this Court in both Sanders and Ansara and apparently by the government in its argument in the latter case. Here the plaintiffs have no alternative means to vindicate their rights. They cannot contest a subpoena issued on the Chemical Bank before the Committee or before the Senate, and they cannot force the bank's uninvolved officials to run the risk of contempt citations and criminal trials to aid the plaintiffs in establishing their First Amendment rights.
 
 SUBJECT MATTER JURISDICTION
 
 53
 The trial court determined that it had subject matter jurisdiction in this case. In doing so it recognized the distinction between determining whether a federal court has "jurisdiction of the subject matter," and determining whether a cause over which a court has subject matter jurisdiction is "justiciable." See Powell v. McCormack, 395 U.S. 486, 512, 89 S.Ct. 1944, 23 L. Ed.2d 491, where the Supreme Court made reference to the distinction drawn in Baker v. Carr, 369 U.S. 186, 198, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In Baker v. Carr, the Supreme Court enunciated two aspects of subject matter jurisdiction relevant to this case: (1) does it fall within the "case or controversy" restriction of Article III, Section 2, and (2) if so, has Congress exercised its power to assign jurisdiction to the Federal District Courts? In light of the treatment given cases in which relief was denied, but as to which this Court has entertained jurisdiction, we think there is no doubt but that the district court had subject matter jurisdiction. See Sanders v. McClellan, 150 U.S.App. D.C. 58, 463 F.2d 894 (1972) and Ansara v. Eastland, supra. A suit brought by one whose constitutional rights are allegedly violated is certainly a "case or controversy" in the Article III sense, and the fact that plaintiffs claim that their First Amendment rights were violated in an amount exceeding $10,000 brings this dispute within the purview of 28 U.S.C. Sec. 1331:
 
 
 54
 "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum of $10,000 . . . and arises under the Constitution, laws, or treaties of the United States."
 
 
 55
 The defendants, as a subsidiary argument as to want of jurisdiction, contend that USSF lacked standing to bring the action because they do not meet the requirement that they show
 
 
 56
 "such a personal stake in the outcome of the controversy as to assure that concrete adverseness, which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed. 2d 663 (1962).
 
 They also claim that
 
 57
 "there is nothing whatever to demonstrate that appellants are aggrieved parties by virtue of direct injury, or that they have the necessary stake in the challenged subpoena to satisfy the 'case' or 'controversy' requirements of Article III, Section 2 of the Constitution."
 
 
 58
 This they contend results from the fact that the subpoena was not directed to appellants, but to a third party commercial bank. This is a makeweight argument at best. If the forced disclosure of the information concerning contributors to and membership in the appellant association violates its First Amendment rights, then it is too clearly an aggrieved person when a third person is under compulsion by the defendants to disclose this information to warrant discussion. If there were otherwise any doubt on this score it has certainly been resolved by Pollard v. Roberts, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968), affirming the judgment of a three-judge district court for the Eastern District of Arkansas, 283 F.Supp. 248 (1968). That court enjoined a state prosecuting officer from subpoenaing party records of the Republican party of the state of Arkansas over the objection that the execution of the subpoena would result in an invasion of the rights of the plaintiffs to freedom of association and freedom of speech.[3]
 
 JUSTICIABILITY
 
 59
 Both Sanders v. McClellan and Ansara v. Eastland, supra, commit this Court to the proposition that a freedom of association challenge to a congressional subpoena is not only a case over which the courts have subject matter jurisdiction, but that such a challenge is a justiciable issue. It is only in order to further clarify the parameters of the justiciability challenge and to relate the contention of Senatorial immunity to justiciability that we do not summarily dispose of this question on the basis of Sanders and Ansara alone.
 
 
 60
 Justiciability embodies two limitations upon the exercise of judicial power: (1) Is the question presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process? and (2) Has resolution of the question been entrusted to the judiciary under the Constitution? The former question is posed here in the form of whether courts may fashion effective relief where the sole remedy lies in the entry of an order running against members of Congress. The second question is whether judicial efforts to fashion relief would be unwarranted intrusion into the arena of political questions.
 
 
 61
 Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1044, 23 L.Ed.2d 491 (1969), thoroughly disposes of the question as to whether a court of equity may enter an order against staff members of House or Senate:
 
 
 62
 "Respondents do maintain, however, that this case is not justiciable because, they assert, it is impossible for a federal court to 'mold effective relief for resolving this case.' Respondents emphasize that petitioners ask for coercive relief against officers of the House, and, they contend, federal courts cannot issue mandamus or injunctions compelling officers or employees of the House to perform specific official acts. Respondents rely primarily on the Speech or Debate Clause to support this contention.
 
 
 63
 "We need to express no opinion about the appropriateness of coercive relief in this case, for petitioners sought a declaratory judgment, a form of relief the District Court could have issued . . . We thus conclude that in terms of the general criteria of justiciability, this case is justiciable." 395 U.S. at 517, 89 S.Ct. at 1962.
 
 
 64
 The availability of declaratory relief against officers of the House, which was all that was necessary in Powell, was clearly viewed by the Supreme Court as a mechanism whereby effective relief against congressional action could be molded by the courts. Likewise, in Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), publication and public distribution of allegedly defamatory and privacy-invading literature by personnel other than members of Congress subsequent to authorization of publication by a House subcommittee, itself immunized, was not protected action under the Speech or Debate Clause.
 
 
 65
 Appellants have not been able to cite any case by the Supreme Court, or by Courts of Appeal, in which a federal court has finally enjoined named committee members of the Congress by way of granting coercive relief of the nature sought here. However, much has been said both by the Supreme Court and by this Court clearly implying that the statutory-equitable relief of issuing a declaratory judgment as to the validity of action taken to give effect to protected congressional committee action might be proper in such a case as this. Probably the strongest statement bearing on this difficult issue is that in Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583, where, in his opinion for the court, at page 621, 92 S.Ct. at page 2625, Mr. Justice White said:
 
 
 66
 "None of this, as we see it, involves distinguishing between a Senator and his personal aides with respect to legislative immunity. In Kilbourn-type situations, both aide and Member should be immune with respect to committee and House action leading to the illegal resolution. So too in Eastland, as in this litigation, senatorial aides should enjoy immunity for helping a Member conduct committee hearings. On the other hand, no prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, in order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen. Neither they nor their aides should be immune from liability or questioning in such circumstances. Such acts are no more essential to legislating than the conduct held unprotected in United States v. Johnson, 383 U.S. 169 [86 S.Ct. 749, 15 L.Ed.2d 681] (1966)." (Emphasis added.)In considering whether this litigation poses a political question which is "not justiciable primarily because of the separation of powers within the Federal Government," Powell v. McCormack, 395 U.S. at 518, 89 S.Ct. at 1962, we begin with the formulation of the political question doctrine set forth in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1964):
 
 
 67
 "After reviewing our decisions in this area, we concluded that on the surface of any case held to involve a political question was at least one of the following formulations:
 
 
 68
 "'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.' 369 U.S., at 217 [82 S.Ct. at 710]."
 
 
 69
 Like Sanders v. McClellan, 463 F.2d at 897, our case falls within none of these six categories, though (1) whether there is a "textually demonstrable constitutional commitment of the issue to coordinate political department" and (2) whether there exists "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government" merit further analysis.
 
 
 70
 In Powell, the respondents contended that Art. I, Sec. 5, Clause 1[4] of the Constitution was "a 'textually demonstrable constitutional commitment' to the House of the 'adjudicatory power' to determine Powell's qualifications." After first determining "what power the Constitution confers upon the House through Art. I, Sec. 5," 395 U.S. at 519, 89 S.Ct. at 1962, the Supreme Court proceeded to hold that this provision committed to Congress the power "to judge only the qualifications expressly set forth in the Constitution." 395 U.S. at 548, 89 S.Ct. at 1978, Powell concededly met these qualifications and was not excluded by the House for failure to meet these, so the Court held that his exclusion by the House on other purported grounds of disqualification was justiciable.
 
 
 71
 In the case before us there is also no "textually demonstrable commitment" of the issue we are called upon to resolve. The government does not contend that the Speech or Debate Clause, Art. I, Sec. 6, Cl. 1[5] of the Constitution is such a commitment and since it could not seriously be contended that the acts giving effect to the committee resolution (like the conduct of the Sergeant of Arms in the Kilbourn case)[6] are within the protection of the Speech or Debate Clause, this Clause does not commit to the Senate the power to determine the legality of the subpoena.
 
 
 72
 In Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), the Supreme Court determined that the Speech or Debate Clause protected committee members
 
 
 73
 "for introducing material at committee hearings that identified particular individuals, for referring the report that included the material to the Speaker of the House, and for voting for publication of the report," Id. at 312, 93 S.Ct. at 2024.
 
 
 74
 but did not protect even members of Congress insofar as they published the report subsequently to the general public. By way of explanation, the Court said that
 
 
 75
 "a member of Congress may not with impunity publish a libel from the Speaker's stand in his home district, and clearly the Speech or Debate Clause would not protect such an act even though the libel was read from an official committee report." Id. at 314, 93 S.Ct. at 2025.
 
 
 76
 Analogizing to the instant case, we think the Speech or Debate Clause does protect the Senatorial parties from liability for authorizing even an unconstitutional subpoena, but does not protect whatever parties issue or serve such a subpoena upon a third party.
 
 
 77
 We conclude, therefore, that the issue presented by this complaint is one over which the court has subject matter jurisdiction; it is justiciable; it cannot be challenged on the ground that it deals with a "political question" or on the basis of legislative immunity.
 
 THE RIGHTS CLAIMED TO BE VIOLATED
 
 78
 The United States Servicemen's Fund bases its claim for relief principally upon a threat to the right of freedom of association and assembly and protest under the First Amendment. It also, however, attacks the validity of the subpoena on the ground that the record discloses that neither the Senate Resolution, nor the Committee's resolution thereafter nor the specific resolution authorizing the chairman to issue subpoenas in support of an investigation of USSF has the specificity required by law before such a subpoena can issue. In view of the fact that USSF is not the subject of the subpoena itself, we think the relevance of its attack on the absence of a showing of any nexus between the organization and the stated purpose of Congress is to be viewed only as it bears upon the necessity for the courts to balance the power of Congress to conduct its legislative procedures over against the First Amendment rights of the citizen. We, therefore, turn to the alleged deprivation of constitutional rights which USSF says would inevitably occur unless the subpoena were invalidated.
 
 
 79
 The right of voluntary associations, especially those engaged in activities which may not meet with popular favor, to be free from having either state or federal officials expose their affiliation and membership absent a compelling state or federal purpose has been made clear a number of times. See NAACP v. Alabama, 357 U.S. 449, 78 S. Ct. 1163, 2 L.Ed.2d 1488; Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); Gibson v. Florida Legislative Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1962); Pollard v. Roberts, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968), affirming the judgment of the three-judge district court for the Eastern District of Arkansas, 283 F.Supp. 248 (1968).
 
 
 80
 In its denial of the motion to dismiss the petition, entered at the same time as the order denying the preliminary injunction, the trial court properly determined that, upon the facts shown "there has been no evidence that any of its [USSF's] activities, or those it supports, have been of a type not protected by the First Amendment." The court, however, in balancing this right against the undoubted power of Congress to conduct committee investigations, found that the proof of irreparable damage to the plaintiffs was lacking. Such proof being absent, and the court having determined it could not find "probably success at a full trial," it determined that a preliminary injunction should be denied.
 
 
 81
 It is clear that the factual weakness of the plaintiff's case, as viewed by the trial court, weighed heavily in its decision to deny the preliminary injunction.[7]
 
 
 82
 Although the evidence of damage, necessarily opinion evidence because no time had elapsed to permit proof of actual loss, was substantial, we need not determine whether this fact finding of the trial court was clearly erroneous. This is true because following this court's stay order of July 28, 1970, the trial court held an entirely new hearing of the case on the merits. In doing so the court followed the suggestion contained in this court's order:
 
 
 83
 "It appears to the Court that determination of the appeal may well turn on its assessment of the merits. Stamler v. Willis, 415 F.2d 1365 (7th Cir., 1969), cert. denied sub nom. Ichord v. Stamler [399 U.S. 929, 90 S.Ct. 2231, 26 L.Ed.2d 796] 38 U.S.L. W. 3522 (June 30, 1970). It would therefore be in the interest of justice if the case could proceed expeditiously in the District Court on the merits. The final judgment of the District Court is likely to be appealed whichever way the court rules. By expedition of that appeal and consolidation with the instant appeal, it may be possible both to proceed with expedition and to ensure that a question of importance is determined with the best available perspective, both as to underlying evidence and the appraisal thereof by the District Judge."
 
 
 84
 At this subsequent hearing on the merits for permanent injunction, following this Court's order, the plaintiffs greatly bolstered its proof of monetary injury, both by opinion testimony touching on the effect of subpoenaing the records of such a controversial organization, and by testimony by officials of the organization of substantial loss of subscriptions from potential and former supporters. The trial court foreclosed the plaintiffs from eliciting answers to questions put to officers and fund raisers who were witnesses at the trial in which the plaintiffs sought to show that certain substantial contributors had stated as a reason for not contributing a "fear of publicity attendant upon their having their identity revealed, especially the Congress investigating committee which motivates them to withhold donations which they in the past have made and are now refraining from making for that purpose." The court sustained an objection to such testimony on the ground that it was "hearsay".[8] It is questionable whether the testimony sought to be given was objectionable as hearsay, because the statements which the witnesses undertook to make to the effect that identified persons gave as the reason for not contributing their fear outlined above would seem to be admissible to show that the fund raising efforts of USSF were being interfered with because of the existence of the investigation. Such statements would not, of course, be admissible to prove the truth of the reason for not giving that the witness would say the potential contributor had given him. However, we do not need to resolve this question, for the court permitted opinion testimony from several professional fund-raisers as well as testimony, not objected to, that certain potential donors had stated the reasons to be such "fear" although earlier witnesses were not permitted to testify.
 
 
 85
 One of the professional witnesses, a professional fund-raiser,[9] gave the following opinion based on his experience as an expert in this field:
 
 
 86
 "Fund raising is a very competitive thing. The reason we have many fund raisers as a profession is we don't create causes, but we do have an expertise in how to motivate people who want to give to various causes, in the peace movement itself, I think the Servicemen's Fund or a cultural organization, or a peace organization, there are dozens of organizations vying for the donor's dollar. Anything which can discourage people, anything which leads people to decide to deflect their contribution from one organization to another can be fatal to a fund raising effort of the particular organization. Certainly they feel their names might be turned over to a Congressional Committee which might be publicized, that there would be publicity about the fact that he had donated could have a devastating effect on fund raising of any organization."
 
 
 87
 One other professional fund raiser with some 17 years experience of the same kind, testified in much the same terms. Finally, in cross-examining the fund raiser and secretary-treasurer of USSF, the following exchange occurred:
 
 
 88
 "Q. [by Government Counsel] You testified to some diminution in contributions received. I take it you are not attempting to say in all cases as to every donor and any particular potential donor exactly why or why not that individual has in fact ceased to contribute as much as they had before or perhaps you didn't get a contribution?
 
 
 89
 A. That is correct, and certainly I am aware of specific cases, to me at least, the cause is quite apparent, the publicity about the subpoena."
 
 
 90
 Explicit testimony was given that approximately a 50 percent curtailment in money distributed by USSF for maintenance of coffee houses and supporting a large number of G.I. newspapers had occurred during the period following the service of the subpoena and that this was approximately "a reflection of the drop in contributions." These payments were significant in amount, "from roughly $10,000 a month to $5,000" in the eight month period (the subpoena was served on April 20, 1970; the trial was held on February 23, 1971).
 
 
 91
 The government made no effort to produce any contrary evidence.[10]
 
 
 92
 The trial court held the matter under advisement from February 23, 1971 until October 21, 1971, at which time it denied the plaintiffs' motion for permanent injunction, and denied their motion to compel testimony from General Counsel Sourwine, of the Committee. In the meantime, this Court's stay had been in effect. Thereafter it has been stayed under the earlier order of this Court "pending further order of this court".
 
 
 93
 Strangely enough, following a hearing on the merits as directed by this Court in its stay order of July 28, 1970, particularly to permit "a question of importance [to be] determined with the best available perspective, both as to underlying evidence and the appraisal thereof by the district judge" (emphasis added), the trial court not only did not make any appraisal of the evidence introduced at the trial on the merits, but it made no finding of fact in relation to it and did not indicate that the evidence at the trial was any different from that introduced on the hearing for preliminary injunction. The court merely said "as neither the hearings on the motion nor the supporting briefs raised new matter, the court relies on its memorandum of June 30, 1970, in which these issues are fully discussed, and finds no violation of the First of Fifth Amendments."
 
 
 94
 Regardless of whether the evidence of injury was adequate in June, 1970, to require the trial court to issue a preliminary injunction, there can be no doubt that the undisputed evidence at the trial unmistakably establishes the fact that immediate and irreparable injury would result from the execution of the subpoena. One evidentiary fact that emerged in addition to the testimony of actual damage which was not before the court at the preliminary hearing, was testimony that the identity of even ostensibly anonymous and secret donors would be disclosed by examination of the bank's records. From what we know of the methods of discovery available to the Committee this evidence is convincing. Moreover, the government's brief makes crystal clear the fact that the purpose of the subpoena was to ascertain the names of the contributors to the fund and that this would be an effective means to accomplish it.
 
 
 95
 "The information sought to be subpoenaed herein consists of the bank records relating to appellant organization. Those records may shed considerable light on various pertinent questions and could furnish leads for further investigation. For example, knowledge of the identities of individuals and organizations providing funds could assist in answering questions as to whether any of appellants' funding comes from foreign sources, or from known subversive organizations and individuals."
 
 
 96
 This later testimony completely negatives the implications from the court's statement in its original order that "moreover, several contributors are said to have remained anonymous even from the USSF officials; manifest disclosure of bank records can have little effect on their continued contributions, and future contributors can readily undertake similarly to preserve their anonymity." However justified this statement may have been in June, 1970, it is totally unsupported by the record at the trial on the merits. Furthermore, as just pointed out above, the government's brief points to the means by which the identity of anonymous donors could be ascertained even though their names might actually not be known to the officers of the USSF:
 
 
 97
 "The information sought to be subpoenaed herein consists of the bank records relating to appellant organization. Those records may shed considerable light on various pertinent questions and could furnish leads for further investigations." (emphasis added).
 
 
 98
 Can it be doubted that if the bank's records show receipt of a contribution from a brokerage firm (as witnesses testified some were received) further investigation of the brokerage firm would disclose the identity of the person whose account was charged with the corresponding amount? The same of course could follow from tracing of a cashier's check or the tracing of a check from a named foundation whose name did not identify the individual who controlled the foundation.
 
 
 99
 The trial court simply failed to make any findings of fact following the extensive testimony at the hearing on the merits. It follows, of course, that the court made no "appraisal thereof" in any manner that would carry out the clear mandate of this court, supra.
 
 
 100
 The showing made by the plaintiffs clearly meets the standards found to exist in those cases in which the Supreme Court has determined that the First Amendment was violated. See NAACP v. Alabama, supra, and other cases cited. Nor is it significant that what is subpoenaed here is bank records rather than membership lists. See Pollard v. Roberts, supra, in which the Supreme Court affirmed the judgment of the three-judge district court in Arkansas holding that the equitable powers of the court should intervene when a local prosecutor sought to obtain the financial records of the Arkansas Republican Party, even though the prosecutor was acting in connection with the proper effort to investigate charges of criminal violations of the Arkansas statutes as to the expenditure of funds.
 
 
 101
 It is true that the cited cases came to the Supreme Court as a result of state action usually resulting in punishment for contempt for failure of the organization to produce its own records (the exception being Pollard v. Roberts, supra). We think this is not a distinguishing factor, since the standard used in deciding whether to vindicate the guarantee of free speech and assembly must be the same when the contest is between the individual and a state legislature as it is between an individual and the United States Congress.
 
 
 102
 It is abundantly clear from this record that USSF and the coffee houses and G. I. newspapers it supported were "controversial" organizations in the same sense as were the N.A.A.C.P. and the Republican Party of Arkansas in the early 60's.
 
 
 103
 We conclude, therefor, that the rights of the plaintiffs here are of the same quality that the courts have long undertaken to protect.
 
 
 104
 As we have indicated above the appellants claim that the subpoena was defective because of the lack of specificity or the showing of a nexus between the purpose of the original Senate Resolution authorizing investigations of this general nature and the USSF and of the SubCommittee resolution. It is true that the Sub-Committee resolution of March 11, 1970, did not recite any basis for the investigation of USSF other than that "information collected pursuant to the Sub-Committee's resolution of October 14, 1967 [authorizing the investigation of the National Conference of New Politics] makes a prima facie showing that the organization [of which USSF was one] and individuals hereinafter named should be subject to further investigation." There may thus be a substantial question if properly and timely raised whether the resolution authorizing the subpoena gave adequate notice of pertinency to the subject of investigation to withstand attack. In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154. While heretofore the courts have only required such a showing to be made when a recalcitrant witness, threatened with prosecution for contempt, insists that the same notice be made as is required in a criminal prosecution by indictment or information, we pretermit altogether the question whether or not a similar showing must be made where there is not contempt prosecution at hand. Moreover, since it is clear that the government's opposition to the relief sought here is primarily based upon the immunity of a co-equal branch of the government from court interference, we could not avoid resolving the issue of Senatorial immunity even if we were to decide that the USSF is in a position to challenge the specificity of the authorization of the subpoena and that the subpoena was invalid for want of specificity.
 
 PARTIES AND REMEDY
 
 105
 Following the denial of the preliminary injunction and prior to the hearing on the merits, the trial court dismissed the Senator defendants from the suit, concluding "that said defendants are personally immune from suit," citing Dombrowski v. Eastland, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).
 
 
 106
 As we have previously noted appellants have not been able to cite any case, by the Supreme Court, or by Courts of Appeal, in which it has been held that named committee members of the Congress may be made the subject of a judgment of the court. However, in discussing the question of justiciability we called attention to the language of the Supreme Court opinion in the Gravel case, which when taken in light of existence of the remedy of declaratory judgment, strongly points to the conclusion that, if finally necessary to vindicate a constitutional right, Members may be responsive to court proceedings. We quote again the pertinent language:
 
 
 107
 ". . . On the other hand, no prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, in order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen. Neither they nor their aides should be immune from liability or questioning in such circumstances. Such acts are no more essential to legislating than the conduct held unprotected in United States v. Johnson, 383 U.S. 169 [86 S.Ct. 749, 15 L.Ed. 2d 681] (1966)." (Emphasis added). 408 U.S. 606, 621, 92 S.Ct. 2614, 2625.
 
 
 108
 The scope of the immunity of Members for actions within the legislative sphere has now been particularized in Doe v. McMillan, supra, decided since this case was submitted. It is now clear that there is no relaxation of the immunity of a Member for participating in the debate of, or action in relation to, a measure in Congress merely because the objective of the action may be unconstitutional. The Court said:
 
 
 109
 "Congressmen and their aides are immune from liability for their actions within the 'legislative sphere' even though their conduct, if performed in other than legislative context, would in itself be unconstitutional . . ." Doe, supra, 412 U.S. at 312, 93 S.Ct. at 2025.
 
 
 110
 The Court thus sharpens the distinction between the "legislative sphere" and the non-legislative acts carried out either by Members or others.
 
 
 111
 "Members of Congress are themselves immune for ordering or voting for a publication going beyond the reasonable requirements of the legislative function, Kilbourn v. Thompson, supra [103 U.S. 168, 26 L.Ed. 377], but the Speech or Debate Clause no more insulates legislative functionaries carrying out such nonlegislative directives than it protected the sergeant at arms in Kilbourn v. Thompson when, at the direction of the House, he made an arrest that the courts subsequently found to be 'without authority.' Id. at 200 [of 103 U.S.]. [Footnote omitted.] See also Powell v. McCormack, 395 U.S. , at 504 [89 S.Ct. 1944, at 1955, 23 L.Ed.2d 491]; cf. Dombrowski v. Eastland, 387 U.S. 82 [87 S.Ct. 1425, 18 L.Ed.2d 577] (1967). The Clause does not protect 'criminal conduct threatening the security of the person or property of others, whether performed at the direction of the Senator in preparation for or in execution of a legislative act or done without his knowledge or direction."'
 
 
 112
 Footnote 9 in the above quoted text clearly deals, it seems to us, with the question before us by quoting language from Gravel, supra, analyzing the Kilbourn case:
 
 
 113
 "That the House could with impunity order an unconstitutional arrest afforded no protection for those who made the arrest," citing Gravel v. United States, 408 U.S. at 618, 92 S. Ct. at 2624.
 
 
 114
 Here, we have concluded that the forced surrender by the bank of the subpoenaed records in response to the subpoena would invade the constitutional rights of the plaintiffs. Such a determination seems well within the intendment of the language of the court in Gravel, already quoted above, that Members of Congress would have no immunity if they, "in order to secure information for a hearing, themselves . . . invaded the privacy of a citizen," Gravel, supra, 408 U.S. 621, 92 S.Ct. 2625.
 
 
 115
 Such a determination as this can, of course, be made only in connection with a "case or controversy," which, in turn, exists only if there are adversary parties. The trial court, not distinguishing between the actions within the "legislative sphere" which are immune and those beyond, which are not, left no opportunity to the parties to develop a record upon which the court could draw the line between what was privileged and what was not. The court dismissed the complaint against the Senator defendants without drawing such a line.
 
 
 116
 The trial court also sustained the refusal of defendant Sourwine, the committee counsel, to answer any question at his deposition hearing except such as related to facts already disclosed by public record. The plaintiffs were therefore precluded from obtaining information from committee counsel as to the actions of staff members of the committee which may well have thrown light upon the identities of those persons who, under our concept of the case, would stand in the shoes of Mr. Thompson, the Sergeant at Arms of the House of Representatives in that famous case.
 
 
 117
 We conclude, therefore, that the trial court erred in dismissing the Senator defendants at the then stage of the proceedings. In light, also, of the line of demarcation, which we think the Court has drawn between "legislative" protected acts and non-legislative non-protected conduct, which may properly be inquired into by the courts, the trial court should consider the extent to which committee counsel should properly be required to give evidence as to matters without the "legislative sphere." We further conclude that if, upon further consideration of the actions of individual members of the staff, the trial court should conclude that the case can better proceed to a decision on the validity of the subpoena by the addition of other parties. The court should be liberal in granting the right of amendment to the plaintiffs for that purpose.
 
 
 118
 We do not, of course, intimate that the court should lightly include a Senator or Member of the House of Representatives as a defendant in litigation of the kind with which we are here concerned except under unique circumstances-circumstances, which may or may not develop in this litigation, that demonstrate that such Member's presence in the litigation is unavoidable if a valid order is to be entered by the court to vindicate rights which would otherwise go unredressed. Moreover, the fact that we conclude that it is appropriate in this case to reinstate the Senator defendants does not, of course, mean that it is necessary for the court, in order to grant relief, to enter any coercive order. The jurisprudence clearly indicates, it seems to us, that where relief can be adequately granted in a suit against a Member of the Congress or a Member of the Executive Department by a declaratory judgment, such procedure is preferable. In Powell v. McCormack, supra, 395 U.S. at 517, 89 S.Ct. at 1962, in discussing the question of justiciability, the Court said:
 
 
 119
 "We need express no opinion about the appropriateness of coercive relief in this case, for petitioners sought a declaratory judgment, a form of relief that the District Court could have issued. The Declaratory Judgment Act, 28 U.S.C. Sec. 2201, provides that a district court may 'declare the rights . . . of any interested party . . . whether or not further relief is or could be sought.' The availability of declaratory relief depends on whether there is a live dispute between the parties, Golden v. Zwickler, 394 U.S. 103 [89 S.Ct. 956, 22 L.Ed.2d 113] (1969), and a request for declaratory relief may be considered independently of whether other forms of relief are appropriate. See United Public Workers v. Mitchell, 330 U.S. 75, 93 [67 S.Ct. 556, 566, 91 L.Ed. 754] (1947); 6A J. Moore, Federal Practice p 57.08 (2d ed. 1966); cf. United States v. California, 332 U. S. 19, 25-26 [67 S.Ct. 1658, 16611662, 91 L.Ed. 1889] (1947). We thus conclude that in terms of general criteria of justiciability, this case is justiciable."
 
 
 120
 It is not doubted that such a declaratory judgment will adequately protect the rights of the plaintiffs. Again, in Powell v. McCormack, 395 U.S. at page 499, 89 S.Ct. 1944, the Court pointed to the effectiveness of a declaratory judgment.
 
 
 121
 The judgment of the trial court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.
 
 MacKINNON, Circuit Judge, dissenting:
 
 122
 In my view the majority opinion does not face up to the facts or to the legal principles that make the subject subpoena a valid exercise of the investigative power by the United States Senate. I thus respectfully record the following dissent.
 
 The United States Servicemen's Fund
 
 123
 The United States Servicemen's Fund (USSF) was incorporated in Delaware as a nonprofit membership corporation on January 6, 1969 and was granted an exemption from the payment of federal income taxes by the U. S. Internal Revenue Service in March 1969 (A. 147, 135). Its certificate of incorporation sets forth a number of charitable and educational purposes.[1]
 
 
 124
 Allegedly in the exercise of these corporate powers the USSF, among other activities, established a number of so-called "coffee houses" near and on about 17 large federal military installations (A. 119, 148, 152) and also furnished financial assistance to about 75 newspapers which were distributed on federal military bases around the world (A. 120, 150).
 
 
 125
 In engaging in these activities the USSF contended that the activities of these coffee houses and newspapers were needed by men in the U. S. military services because such men "are in effect, inmates of a totalitarian institution" (A. 122-23) similar to "prisons, convents, boarding schools [and] mental hospitals" (A. 125) and need the "education"[2] available through the USSF coffee houses and USSF supported newspapers for their "psychological well being" (A. 128). As used by the USSF the term "education" was not used in its ordinary sense of personal development but rather referred to efforts to convert military personnel into opponents of the Vietnam War. This is clear from the description given at trial by Mr. Gutman, their counsel, of the type of "education" provided by the USSF:
 
 
 126
 The Servicemen's Fund indeed does educate a great deal on the issues which most concern servicemen, which, of course, is the war, and the library, educational material and discussions which are carried on through the publication and meeting facilities and the library of the servicemen do indeed deal to a large extent with issues of the war, legality, the morality, the practicality and so on of the war, and the immediate issue most concern the men who are fighting and being trained to fight it. (A. 221)
 
 
 127
 Through its activities the USSF stated that it sought to bring about the "immunization" of soldiers "against the assaults of the military posts" and other "total institutions" so that they would "associate with those people of like views . . . [and] develop [a] system of counter mores . . . and a sense of personal identity or autonomy with the group of people that sits outside the total institution" (A. 125, 130). When we translate the foregoing into plain English, the USSF admits that it was seeking through its coffee houses and the newspapers it supported to convert military personnel into opposing the United States military operations in Vietnam (A. 150, 221) and in actual practice that is what the record indicates it was attempting to do.
 
 
 128
 Such activities brought complaints against the coffee houses and some of the personnel associated with acts which resulted from USSF supported activity. While the record at trial was not required to go extensively into such matters there was testimony indicating that the USSF coffee house at Ft. Dix was attacked by rocks, projectiles, hand grenades and several gunshots (A. 153); that the staff members of its South Carolina coffee house had been convicted of operating a common nuisance and the house padlocked (A. 153); and that one individual activist who was participating in USSF funded activities "was a bad influence around trainees, and that he was bad for the morale and discipline among the troops" (A. 110, 169-180).[3]
 
 
 129
 From a reading of the entire record it is apparent that in numerous instances, the methods the USSF elected to follow in carrying out its opposition to the United States military operations in Southeast Asia were calculated to attack the morale of service personnel and were intended to be disruptive of the then current mission of the United States military establishment in Southeast Asia as directed by national policy established jointly by the Presidents and Congresses since the 1960's. Such activities could not help but create a reasonable cause for concern.[4]
 
 The Investigation by the Subcommittee
 
 130
 Faced with such disruptive activities by the USSF directed at the morale of the armed services carrying out duly declared national policy,[5] the Subcommittee on Internal Security of the Committee on the Judiciary of the United States Senate decided to investigate. In S. Res. 341, the 91st Congress had previously authorized such Subcommittee
 
 
 131
 to make a complete and continuing study and investigation of (1) the administration, operation, and enforcement of the Internal Security Act of 1950, as amended; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United States; and (3) the extent, nature, and effect of subversive activities in the United States, its territories and possessions, including, but not limited to, espionage, sabotage, and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force or violence.[6]
 
 
 132
 Acting pursuant to such authority the Subcommittee duly adopted resolutions to subpoena certain information relevant to the activities of the USSF. The Subcommittee resolution provided:
 
 
 133
 WHEREAS, information collected pursuant to the Subcommittee's resolution of October 14, 1967 makes a prima facie showing that the organizations and individuals hereinafter named should be the subject of further investigation, it is directed that such investigation be carried forward by the staff; and that when the Chairman shall conclude that the results of staff investigation with respect to any such person or organization indicate the desirability of a hearing or hearings, the Chairman is authorized to issue appropriate subpoenas, including subpoenas duces tecum, to insure attendance of necessary witnesses and the production, if required, of material evidence.
 
 
 134
 ******
 
 
 135
 * * *
 
 
 136
 The foregoing applies with respect to: United [States] Servicemen's Fund, Inc. (A. 64-65)[7]
 
 
 137
 Thus, it came to be that on May 28, 1970 the Subcommittee issued a subpoena to the Chemical Bank of New York City, over the signature of Senator James O. Eastland, Chairman of the Committee on the Judiciary and the Subcommittee on Internal Security. The text of the subpoena provided:
 
 UNITED STATES OF AMERICA
 Congress of the United States
 To Chemical Bank
 20 Pine Street
 New York, N.Y., Greeting:
 
 138
 Pursuant to lawful authority, YOU ARE HEREBY COMMANDED to furnish to the Subcommittee on Internal Security of the Committee on the Judiciary of the Senate of the United States, on Thursday, June 4, 1970, at 10:00 o'clock a.m., at their committee room 2300, New Senate Office Bldg., Washington, D. C. 20510, pursuant to S.Res. 366, 81st Congress-2d, as amended and extended, and S.Res. 341 agreed to February 16, 1970, any and all records appertaining to or involving the account or accounts of the United States Servicemen's Fund. Such records to comprehend papers, correspondence, statements, checks, deposit slips and supporting documentation, or microfilm thereof within your control or custody or within your means to produce.
 
 
 139
 Hereof fail not, as you will answer your default under the pains and penalties in such cases made and provided.
 
 
 140
 To Any U. S. Marshal to serve and return.
 
 
 141
 Given under my hand, by order of the committee, this 28th day of May, in the year of our Lord one thousand nine hundred and seventy.
 
 
 142
 /s/ JAMES O. EASTLAND, U.S.S. Chairman, Committee on the Judiciary and the Subcommittee on Internal Security
 
 
 143
 The obvious objective in issuing this subpoena to the bank which carried the USSF deposit (A. 199) was to obtain information as to the finances of the USSF and as to who was financially supporting it in its activities. Is this a legitimate subject of inquiry by the Subcommittee? Appellants contend that it is not for various reasons. The only reason that is now important is their claim that compliance with such subpoena would interfere with their right under the First Amendment of the Constitution to freedom of association. In this respect they contend that publishing the names of their contributors by giving then to the congressional committee "could have a devastating effect on fund raising of any organization" (A. 212). At trial, there was testimony that financial contributions to the USSF did fall off for this reason. However, the testimony does not negate that they may well have fallen off because the true nature of some of the activities of USSF were disclosed. Basically the claim is made that the contributions fell off because resulting publicity was not desired by a great many of their financial contributors. Some of these contributors are in themselves "foundations" and these organizations, and the individuals who use them for such purposes, fear that disclosure of their contributions to USSF "might be damaging to their tax position" (A. 208) under the Internal Revenue laws (A. 201). Some of the contributors are tax exempt corporations (A. 197), as is the USSF (A. 147).
 
 
 144
 Testimony indicated that some of the contributors use various means to cenceal their identity as contributors, including the use of corporations, foundations and other entities (A. 194, 195, 209, 217) and the making of contributions in cash, cashiers checks (A. 195), cashiers checks with no names (A. 217), checks from brokerage houses (A. 196, 217) and through the use of funds that do not bear the family name of the contributor (A. 199). Such surreptitious methods to conceal the identity of the donors are used by "major contributors" (A. 199) and, in one other instance testified to, the contribution was "a large check . . . a substantial contribution" (A. 200). One fund raiser for the USSF testified that he received a "substantial contribution" in the form of a "bank check" that he could not trace (A. 200). Another fund raiser testified that in the last year or so she had never known "so many large contributions [to be] given anonymously" (A. 216). Whether all this evidence related to USSF contributors is not clear, but the evidence was offered in support of their claim so apparently similar instances occurred in their fund raising. So it appears that there is a strong possibility that the USSF received substantial contributions to support its activities from sources unknown even to it. These sources, as well as those sources who make their contributions without any effort at concealment, might be uncovered if this investigation is allowed to continue (A. 200).NAACP v. Alabama and Other Decisions
 
 
 145
 The USSF contends, and the majority opinion supports such contention, that the Senate investigation of its activities through the subject subpoena should not be allowed to continue because such action would unconstitutionally deprive the USSF of its First Amendment right to freedom of association. The majority opinion states the issue to be whether the courts of the United States have power to interfere with a congressional subpoena "when the exercise of such power threatens a deprivation of First Amendment rights of freedom of association which can be vindicated in no way other than by court decree" (Majority opinion, p. 1254). Having so stated the issue it concludes that the courts do not possess such power. In reaching such conclusion, without analysis, it relies upon five decisions: NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L. Ed.2d 1488 (1958); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L. Ed.2d 480 (1960); Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); Gibson v. Florida Legislative Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); and Pollard v. Roberts, 393 U. S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968), affirming the judgment of the three-judge District Court for the Eastern District of Arkansas, 283 F.Supp. 248 (1968).
 
 
 146
 The basis of the majority opinion is its assertion that the five cited decisions, supra, uphold the right of voluntary associations especially those "engaged in activities which may not meet with popular favor, to be free from having either state or federal officials expose their affiliation and membership absent a compelling state or federal purpose . . . ." However, I find the five cases to be distinguishable on their facts and on grounds that justify a finding that the facts here present a "compelling . . . federal purpose." In my view when the majority opinion cites these five cases in a conclusory way it does not come to grips with the basic facts or the principles of law announced by the Supreme Court that must control the decision here.
 
 
 147
 In NAACP v. Alabama, supra, the Supreme Court held that the State of Alabama in its attempt to obtain the local NAACP membership lists in Alabama as part of the attempt by the state to enjoin the NAACP further in, and to oust the organization from, the state had failed to show a controlling justification for the deterrent effect that such disclosure would have on the right of its members to associate. The subpoena that sought to compel such disclosure was a state court subpoena, no issue involving the separation of powers, federal or state, was presented and the right of association was being exercised in support of racial rights guaranteed by the Constitution which sufficiently overcame whatever interest the state had in obtaining the names of the NAACP's ordinary members.
 
 
 148
 Bates v. Little Rock, supra, held that two occupational license tax ordinances which required local branches of the NAACP to furnish the city officials with lists of the names of the members of the local branches of the association violated the members' right to freedom of association. The Court (Stewart, J.) recognized that the proper and efficient exercise of the power to tax may sometimes entail the possibility of encroachment upon individual freedom but it was unable to find any "relevant correlation between the power of the municipalities to impose occupational license taxes and the compulsory disclosure and publication of the [local NAACP] membership lists . . .." 361 U.S. at 524-525, 80 S.Ct. at 417-418. This decision involving a local taxing ordinance is a far cry from the factual situation which confronts us, holding, as it does, merely that the evidence sought was not relevant.
 
 
 149
 The third decision relied upon by the majority opinion is Louisiana ex rel. Gremillion v. NAACP, supra, which in 1961 affirmed a three-judge court decision in Louisiana rendered in a declaratory judgment action brought by the NAACP. It held that a Louisiana statute, which required "fraternal . . . charitable . . . [and] social organizations" to file annually with the Secretary of State a complete list of all local members and officers, violated the NAACP members' constitutional rights to freedom of association as guaranteed by the First Amendment. Some local affiliates in Louisiana of the NAACP had filed membership lists and thereafter some of its members were subjected to economic reprisals. The case stands for the principle that a state statute directed at "non-trading" corporations cannot constitutionally be applied to associations organized to further the civil rights of Negroes where the required disclosure of membership lists results in subjecting the members to economic reprisals. No question involving the separation of powers was involved and no issue was present as to the legislative right to investigate. The case is merely another extension of the recognized protection that the Constitution gives to Negro rights.
 
 
 150
 In 1963 the Supreme Court by a 5 to 4 vote decided Gibson v. Florida Legislative Committee, supra. The majority opinion was written by Justice Goldberg and dissenting opinions were filed by Justices Harlan and White. The majority held that it was a violation of the right of freedom of association to convict the president of the NAACP chapter in Miami, Florida, for contempt of a state legislative investigating committee when he refused to testify whether any of 52 or 14 named persons given to him were members of the Miami chapter of the NAACP. The committee had previously developed information that these persons had some relation to Communist activity, and the NAACP, by resolution, had previously recognized that certain branches of the NAACP were "being rocked by internal conflicts between groups who follow the Communist line and those who do not . . . [and] that there is a well-organized, nationwide conspiracy by Communists either to capture or split and wreck the NAACP . . .." The local president was asked by the legislative committee to testify from memory or, after refreshing his recollection, from the membership list. He refused to testify on either basis notwithstanding that the committee made it clear that they were not requiring a disclosure of the membership list.
 
 
 151
 The majority opinion was based upon its assertion that the state had not shown convincingly a substantial relation between the information sought and a subject of overriding and compelling state interest. The basis of the decision, being thus grounded on a finding of irrelevance is distinguishable from the facts here as it will hereafter be demonstrated that there is a direct compelling federal interest in subject inquiry. Moreover, a close reading of the majority and dissenting opinions convinces that the dissents by Justice Harlan and White assert the sounder law on the other points. The legislative committee obviously had a proper basis to ask the questions it did and it could not be required to prove in advance the very things it was attempting to determine. If the Senate could already prove such facts there would be no need for the subpoena. And how any interference with the right to freedom of association is involved is not apparent. It seems clear to me that this decision will not be followed in subsequent cases, and in any event is not applicable here because of the existence here of a compelling Federal interest.
 
 
 152
 The last decision relied upon by the majority opinion is the three-judge district court decision in Arkansas, 283 F. Supp. 248 (1968) which was affirmed Per Curiam by the Supreme Court without opinion in Pollard v. Roberts, supra. (Justice Black was of the opinion that probable jurisdiction should be noted.) In that litigation a state prosecuting attorney in Arkansas was enjoined on First Amendment grounds from subpoenaing the bank records of the Republican Party in the state, because the prosecutor "was required to make a far greater showing of relevancy and public interest in the disclosure than has been made here." 283 F.Supp. at 258. Here again the information demanded was found to be irrelevant. Underlying the decision was the common sense rationale that the list of financial contributors was not relevant to the charge of illegal vote buying that the prosecutor was allegedly investigating.[8] The decision does not hold that a state may never require campaign contributions to be made public but merely refuses to do so "where the demand has no more substantial basis than the one involved in this case," 283 F.Supp. at 259. In fact the decision went on to hold that it was only the disclosure of "contributions" and not "expenditures" that was being enjoined,[9] and that if the prosecutor finds himself in a position to make a showing that would entitle him to see records of contributions of certain individuals that he could apply to the court to modify the injunction. 283 F.Supp. at 259. So the case merely holds that the prosecutor had not made a showing that the requested disclosure was relevant to his inquiry and is not authority for the proposition that lists of contributors can never be required.
 
 
 153
 All these cases are distinguishable from the instant case on the ground that none of them on their facts makes a showing that the lists were requested for a proper purpose.[10] Some are also distinguishable on the additional factual variances pointed out above. Only one of the cases involved a legislative subpoena (state legislature) and that case was decided on the grounds that the subpoena sought irrelevant information, i. e., that there was no adequate showing of a substantial relation between the information sought and a subject of compelling state interest. In the instant case, however, as is pointed out infra, there is a demonstrable relationship between the information sought and the valid legislative interest of the federal Congress. It is also significant that the majority opinion does not come to grips with Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), or Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959). These two cases were decided on the same day and they deal directly with the issues which are here presented.
 
 Balancing the Competing Interests
 
 154
 It is apparent from the facts here that the Senate Committee was attempting to determine the names of some of the individuals and foundations that were financing the USSF. As the majority opinion notes, quoting the Subcommittee's brief:
 
 
 155
 "[K]nowledge of the identities of individuals and organizations providing funds could assist in answering questions as to whether any of appellants' funding comes from foreign sources, or from known subversive organizations and individuals." Supra p. 1267.
 
 
 156
 The Subcommittee and the Congress have a valid legislative interest in ascertaining whether any of the money used to finance any questionable activities of the USSF came from foreign sources or subversive organizations. The activities of coffee houses and newspapers supported by the USSF were designed to, and could not possibly have failed to some extent "to interfere with, impair, or influence the loyalty, morale, or discipline of the military or naval forces of the United States."[11] Such activities might have caused or attempted to cause insubordination, disloyalty, or refusal of duty, and as such would have constituted violations of 18 U.S.C. Sec. 2387(a) which provides:
 
 
 157
 Sec. 2387. Activites affecting armed forces generally
 
 
 158
 (a) Whoever, with intent to interfere with, impair, or influence the loyalty, morale, or discipline of the military or naval forces of the United States:
 
 
 159
 (1) advises, counsels, urges, or in any manner causes or attempts to cause insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States; or
 
 
 160
 (2) distributes or attempts to distribute any written or printed matter which advises, counsels, or urges insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States-
 
 
 161
 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction.
 
 
 162
 If some of the contributors to the USSF were from "foreign principals," there was a definite congressional interest in determining whether the Foreign Agents Registration Act had been complied with. 22 U.S.C. Sec. 611 et seq. Compliance with the Internal Security Act, 50 U.S.C. $ 781 et seq. as the enabling resolution stated, was also a legitimate objective of the investigation by the Subcommittee. In addition, the subject matter of these statutes was also a legitimate subject of congressional inquiry in order to determine whether these laws should be retained, repealed or amended to meet new conditions, or whether new laws were needed. It would also be a permissible goal of the investigation to determine whether any of the contributors has been mislead by the use of the name "United States" in the name of the organization into believing that the USSF was sponsored or approved by the Government of the United States or by the United States Military services or any other United States department or agency. Cf. 18 U.S.C. Sec. 713.
 
 
 163
 The condition and efficiency of the military is a matter of vital concern to Congress, particularly when large scale foreign military operations, such as were under way in 1970, were being undertaken. This concern arises by virtue of the constitutional grant of power to Congress:
 
 
 164
 All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.
 
 
 165
 U.S.Const. art. I, Sec. 1.
 
 
 166
 ******
 
 
 167
 * * *
 
 
 168
 The Congress shall have Power To lay and collect Taxes, Duties, Imports and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States . . ..
 
 
 169
 ******
 
 
 170
 * * *
 
 
 171
 To raise and support Armies . . ..
 
 
 172
 To provide and maintain a Navy;
 
 
 173
 To make Rules for the Government and Regulation of the land and naval Forces;
 
 
 174
 To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;
 
 
 175
 To provide for organizing, arming and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;
 
 
 176
 ******
 
 
 177
 * * *
 
 
 178
 To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.
 
 
 179
 U.S.Const. art. I, Sec. 8.
 
 
 180
 Congress' interest in the military, including its morale, is of long standing. In fact, the very first investigating committee ever established by Congress was directed to inquire "into the causes of the failure of the late [military] expedition under Major General St. Clair." The committee was empowered to "call for such persons, papers and records as may be necessary to assist their inquiries." March 27, 1792, 3 Ann.Cong. 394. It investigated matters relating to the morale of the military personnel involved, as is obvious from the committee report, which referred to desertions and discontent, 3 Ann.Cong. 1110, 1111, and found "the want of discipline . . . in the troops." 3 Ann.Cong. 1111. Numerous subsequent investigations by Congress into military affairs are too well known to need citation. No elaborate authorities, likewise, need be recited for the principle that Congress has power to investigate any subject upon which it might legislate.[12] Thus the authority of Congress to make subject investigation is unquestioned. The only substantial issue that remains is whether the Subcommittee as an arm of the Congress can compel the production of the evidence of appellants' contributors.
 
 
 181
 That the Senate Subcommittee has authority to compel the production of such evidence is fully supported by the Supreme Court's 6 to 3 opinion in Barenblatt v. United States, supra, and its decision in Uphaus v. Wyman, supra. In Barenblatt the majority opinion, written by Justice Harlan, sets forth the precise principles that should control in the situation here presented. In that case the House Un-American Activities Committee was investigating Communist infiltration into the field of education and it sought corroboration from Barenblatt (a psychology instructor at Michigan and subsequently at Vassar) that he had been a Communist while he was a graduate and teaching fellow at Michigan during 1947 to 1950. Barenblatt objected to the Committee investigating his political and religious beliefs or into "any 'other personal and private affairs"' or "associated activities" on the claim that he was privileged not to answer them by the constitutional guarantees of free speech and against self-in-crimination of the First and Fifth Amendments. His claims were denied by the Committee and when he persisted in his refusal on such grounds he was tried and convicted of contempt of Congress. This conviction was ultimately upheld by the Supreme Court and it is principally with the Court's disposal of his First Amendment claims that we are here concerned. This holding is of controlling importance here because it is substantially the same claim that the USSF presently makes, but Barenblatt's claim was stronger because he was making a personal claim following a criminal conviction.
 
 
 182
 In disposing adversely of Barenblatt's appeal the Court held, on the point that is of importance here, that the First Amendment does not protect against disclosure of one's associational relationships in all circumstances:
 
 
 183
 Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown.
 
 
 184
 Barenblatt v. United States, supra, 360 U.S. at 126, 79 S.Ct. at 1093. The earlier opinion by Chief Justice Warren in Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), involving a similar issue, had provided for a similar weighing process:
 
 
 185
 It is manifest that despite the adverse effects which follow upon compelled disclosure of private matters, not all such inquiries are barred . . .. The critical element is the existence of, and the weight to be ascribed to, the interest of the Congress in demanding disclosures from an unwilling witness.
 
 
 186
 Watkins v. United States, supra, 354 U. S. at 198, 77 S.Ct. at 1185.
 
 
 187
 So, in line with these authorities, what we must do here is to balance the competing private and public interests of the USSF and its contributors with those of the United States Government as represented by the powers and valid interests of the Subcommittee of the United States Senate. While the majority opinion refers to such balancing it does not indulge in it. When we do balance the competing interests we fail to find any factors which indicate that the individual interests of the USSF contributors are not subordinate to those of the Government as represented by the valid legislative interests of the Congress acting through the Senate Subcommittee. As pointed out above the interests of the nation in the personnel of our armed services, and the security of the nation, when coupled with the express grants of constitutional power to Congress, set forth supra, clearly authorize Congress to investigate the subject matter presented by the activities of the USSF. We so held in Barsky v. United States, supra, stating:
 
 
 188
 This existing machinery of government has power to inquire into potential threats to itself, not alone for the selfish reason of self-protection, but for the basic reason that having been established by the people as an instrumentality for the protection of the rights of people, it has an obligation to its creators to preserve itself. 167 F.2d at 246.
 
 
 189
 In my view Congress not only has the right to investigate the activities of the USSF but it also has the duty to do so; and whether the threat is sufficient to constitute a "clear and present danger" is not controlling on the power of Congress. As we said in Barsky:
 
 
 190
 We are referred to the "clear and present danger" rule expressed by Mr. Justice Holmes in Schenck v. United States [249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470] and extending through the line of cases cited and discussed in Bridges v. State of California [314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192]. But all those cases dealt with statutes which actually imposed a restriction upon speech or publication. In our view, it would be sheer folly as a matter of governmental policy for an existing government to refrain from inquiry into potential threats to its existence or security until danger was clear and present. And for the judicial branch of government to hold the legislative branch to be without power to make such inquiry until the danger is clear and present, would be absurd. How, except upon inquiry, would the Congress know whether the danger is clear and present? There is a vast difference between the necessities for inquiry and the necessities for action. The latter may be only when danger is clear and present, but the former is when danger is reasonably represented as potential.
 
 
 191
 167 F.2d at 246-247.
 
 
 192
 As with the power to investigate Communist activity, the power of Congress to legislate in the field to which this subpoena is directed "[i]n the last analysis . . . rests on the right of self-preservation, 'the ultimate value of any society."' Barenblatt v. United States, supra, 360 U.S. at 127-128, 79 S.Ct. at 1093. Certainly whether Congress would decide to continue to permit tax exempt funds to be used for such potentially subversive purposes is a proper subject for congressional inquiry as are the additional subjects set forth supra at 1272. Congress frequently prohibits even admittedly nonsubversive tax exempt organizations from making political contributions,[13] and federal law has long required the filing with the Clerk of the House of Representatives of "the name and address of each person who has made a contribution to or for [any political committee, aggregating] $100 or more . . . ."[14] If such admittedly legitimate associational activities can be prohibited or their disclosure compelled, a fortiori, there is no constitutional objection to requiring disclosure from organizations such as the USSF.
 
 
 193
 The subpoena here is also clearly directed to the disclosure of what to all intents and purposes appears to be relevant evidence on a subject the Committee was authorized to investigate and it was duly issued pursuant to proper authority and in my opinion is not overly broad. But appellants assert that their contributors have a right under the associational rights guaranteed by the First Amendment to remain anonymous, i. e., to conceal their identity. This is equivalent to saying that there is a constitutional right of secrecy as to one's public political activities. On such contention United States v. Josephson, 165 F.2d 82, 92 (2d Cir. 1948) holds to the contrary, and Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), holds that one's right of privacy (allegedly based on the First Amendment) does not protect against disclosure of the identity of students engaged in certain acts in public schools of the District of Columbia by a congressional committee report issued by a congressional committee to the extent that such disclosure was reasonably within the legislative sphere. There is no showing here that the information was not being sought for use in the legislative sphere. In addition, as Judge Prettyman remarked in Barsky v. United States, supra:
 
 
 194
 If Congress has power to inquire into the subjects of Communism and the Communist Party, it has power to identify the individuals who believe in Communism and those who belong to the party. The nature and scope of the program and activities depend in large measure upon the character and number of their adherents. Personnel is part of the subject.
 
 
 195
 167 F.2d at 246.
 
 
 196
 The same is true here. The identity of the individual contributors and the names of the contributing foundations is central to the concern of the Congress and is part of the subject matter of the investigation. Thus, if Congress has power to investigate the USSF and other organizations engaged in activities of the same character, then they have authority to discover and if need be disclose the identity of the individuals and foundations who provide the financial support for such organizations. Since Congress has clear authority to legislate on the subject, I see no reason why they cannot investigate fully.
 
 
 197
 Coming then to the extent that the freedom of association may prevent disclosing the identity of contributors, which is the ultimate issue before us, we come back to the answer first given above, which is that, under the conditions present in the instant case, one's rights under the First Amendment are not absolute but must be subjected to a balancing test. In weighing these competing considerations we note it is an associational right that the USSF claims for its contributors-a claimed right of freedom of association. I am unimpressed that there is any potential denial of that right here in so far as that right is conferred by the Constitution. In this respect my view concurs with Judge White's dissenting observation in Gibson v. Florida Legislative Committee, 372 U.S. 539, 584, 83 S.Ct. 889, 9 L.Ed. 2d 929 (1963) to the effect that true freedom of association would be "promoted, not hindered," by disclosing information as to those who were supporting the USSF financially.[15] Disclosure of the identity of contributors would be a guarantee of true freedom of association. What kind of freedom is it for the contributing public to not know the identity of those with whom they are associating? A person who does not know, and cannot learn the identity of his associates in a venture, is not truly free. He does not have sufficient information to make a free choice-his is a compelled choice-compelled partially by lack of vital information-a blind choice.
 
 
 198
 This is a vital point here, because, as the majority opinion admits, even the USSF do not know who some of their substantial contributors are. The existence of these secret donors, and the likelihood that they would be disclosed if the subpoena were enforced, convinces the majority that constitutional rights would thus be infringed. However, in my view this fact is fatal to appellants' First Amendment claims. Certainly they have no right to assert a constitutional claim that they can operate the kind of activity they are carrying out here, involving as it does active opposition to declared national policy within the armed services of the United States, and be completely unaware of the true identity of some of their substantial contributors. The USSF admitted that it does not know the source of some of its substantial contributions. One can search the First Amendment in vain to find any support for the principle that it protects or compels ignorance in such matters. These unknown contributors, as well as some of the contributors known to them, could be agents of foreign principals, or subversive individuals, or the contributing corporations or foundations might be making contributions improperly. If the USSF is engaging in the type of activities here reported and does not know the source of some of its substantial contributions it is acting recklessly and it is time that some person in authority determine the sources and the sooner the better. I see no constitutional right to privacy or secrecy in such matters. The cases cited above are to the contrary. When the USSF stepped into the public area, in my opinion, they forfeited any right to secrecy. Their acts were then public not private-and Congress has a right to investigate them.
 
 
 199
 Uphaus v. Wyman, 360 U.S. 72, 79 S. Ct. 1040, 3 L.Ed.2d. 1090 (1959), decided the same day as Barenblatt is to the same effect on facts which closely resemble the facts here. In that case a subpoena was issued by the Attorney General of New Hampshire, acting on behalf of the state legislature, under a resolution directing him to investigate violations of the state subversive activities act and to determine whether "subversive persons" were then in the state. The opinion by Justice Clark required the executive director of World Fellowship, Inc., a voluntary corporation maintaining a summer camp in New Hampshire, to produce the names of all persons who attended the camp in 1954 and 1955. In so holding, the Court found that the nexus between the corporation, its summer camp and subversive activities which might threaten the security of the state justified the investigation. I find the same valid nexus here between the subversive activities implicit in the allegations of the operations of the USSF and the threat to our security posed by its acts directed at the morale of the armed services, particularly so because some of those financing the questioned activities are unknown to the USSF. It is thus my opinion that the subpoena is valid and should be complied with immediately. I would thus find that appellants were not likely to succeed on the merits for a different reason than the trial court so found, and I would accordingly refuse to issue the requested injunction and the requested declaratory judgment. It may well be that the USSF has a right to continue their propaganda activities but the Congress likewise has a right to know who is doing it, because that may affect much of their existing and possible future legislation.
 
 
 200
 The foregoing conclusion also compels the findings that the subpoena was a valid exercise of legislative power conferred upon Congress by the first sentence of the Constitution[16] and that the separation of powers deprives the courts of any further jurisdiction in the matter. The majority opinion pays lip service to the constitutional doctrine of the separation of powers but then refuses to adhere to its tenets. I find the Court's action in this case in interfering with the powers incident to the legislative function of Congress to be a gross abuse of its judicial powers. Let us assume that when the contributions are traced one of the "substantial contributors" turns out to be a foreign principal or a known subversive organization, or that there are a number of such sources. Would any person question that the Courts were wrong to delay the committee investigation for four and possibly five years? Is that respecting the powers of Congress? What the Court should do is accord the same respect to the actions of the legislative arm that we expect our judicial acts to receive, and that was clearly not done here. Clearly the damage from disclosure is far less than the damage that would result to the valid activities of Congress if it were prohibited from determining facts necessary for informed legislation in this field. Even if nothing subversive or improper is turned up, Congress should still be able to consider whether to continue a tax exemption policy for activities such as USSF. If the cost of this valid consideration by Congress of the activities here sought to be investigated is the destruction of some financial support to the USSF through disclosure of the identity of some of its contributors, or through the fear of such disclosure then in my view it is financial support that should not have been sought in the first place.
 
 
 201
 I also dissent from that portion of the majority opinion which directs the reinstatement of the action against the United States Senators. In doing so the majority admit their inability to "cite any case, by the Supreme Court, or by Courts of Appeals, in which a federal court has finally enjoined named committee members of Congress by way of granting coercive relief of the nature sought here." To my mind it would have been more proper, instead of asserting a negative, to rely upon the recent affirmative holding of Doe v. McMillan, supra, that United States Senators when acting in the legislative sphere are immune from suit.[17] That they were acting here in the legislative sphere is clear beyond doubt. I thus find that the action of the majority does interfere with "a textually demonstrable constitutional commitment of the issue to a coordinate political department [the Congress] [and that there is an] impossibility of [this court] . . . undertaking independent resolution [of the issue] without expressing lack of respect due coordinate branches of government, . . ." Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d, 663 (1962).
 
 
 202
 The majority opinion, however, decides that the "subpoena would invade constitutional rights" and in my opinion it does not since the Subcommittee was acting validly in the legislative sphere and secrecy of activities is not included within the constitutional guarantee to freedom of association. Also, there is no improper invasion of privacy here as public contributions were made by means of checks payable to an organization engaged in public activities and the nature of such public activities destroys any claim of privacy.
 
 
 203
 For all the foregoing reasons I would conclude that the balance between the individual and governmental interests here at stake must be struck in favor of the government and that therefore the provisions of the First Amendment have not been offended. Cf. Barenblatt v. United States, supra, 360 U.S. at 134, 79 S.Ct. 1081.[18]
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 A fuller description of the activities and purposes of the plaintiff organization, which are not now challenged, are described in the complaint as follows:
 "United States Servicemen's Fund (hereinafter, USSF) is a non-profit tax-exempt membership corporation incorporated in the State of Delaware to further the welfare of persons who have served or are presently serving in the military. Among its charitable, educational and legal purposes and powers as stated in its certificate of incorporation are the following:
 1) to stimulate, develop, foster, coordinate, improve and encourage the educational opportunities of military personnel and to protect the civil rights of such persons, by:
 2) Holding public meetings, providing entertainment and other recreational services for the benefit of military personnel;
 3) Executing, sponsoring and encouraging research designed to improve the general welfare of military personnel;
 4) Contributing to the costs of legal representation of military personnel;
 5) Initiating programs, including scholarship programs, designed to further the educational opportunities of military personnel;
 6) Collecting, assembling, exchanging, publishing and otherwise freely disseminating (a) to military personnel and (b) to the general public, knowledge and information relating to the improvement of all aspects of military life.
 In furtherance of these purposes USSF provides funds for (a) the establishment and operation of coffee houses, which are gathering places, and places of recreation for persons in military service as well as the providing of entertainers for military personnel; (b) the establishment and operation of newspapers which provide information particularly of interest to military personnel; (c) the supplying of educational materials such as films, books, periodicals and entire libraries for military personnel; (d) the providing of civilian legal representation for military personnel due to the inadequacies of military justice.
 Both the G.I. coffee houses and newspapers have become the focus of dissent and expressions of opposition within the military toward the war in Vietnam and now Cambodia, and are frequent targets of repressive actions by both civilian and military authorities seeking to silence dissent. All of the activities of USSF are conducted in exercise of its rights under the United States Constitution and particularly the First Amendment guarantees of Freedom of speech, press and association."
 
 
 [2]
 It is clear that these plaintiffs do not seek to enjoin the investigation being conducted by the Internal Security Committee. They seek only to enjoin the enforcement of this particular subpoena
 
 
 [3]
 Recognizing as they do, that, since had the subpoena been served on the plaintiffs themselves, prior decisions of this court and of the Supreme Court would have made equitable intervention of the court unavailable to interfere with the execution of the subpoena, the plaintiffs here posit their entire right to equitable intervention of the district court on the fact that the subpoena was served on a disinterested third party who cannot be expected to test out the legality of the subpoena by subjecting itself to contempt procedures by the Committee or in any other way which would be available to the aggrieved association itself. Cf. Ansara v. Eastland, supra, and Sanders v. McClellan, supra
 
 
 [4]
 "Each House shall be the judge of the elections, returns and qualifications of its own members . . .."
 
 
 [5]
 "The senators and representatives shall receive a compensation for their services, to be ascertained by law, and paid out of the treasury of the United States. They shall in all cases, except treason, felony and breach of the peace, be privileged from arrest during their attendance at the session of their respective Houses, and in going to and returning from the same and for any speech or debate in either House, they shall not be questioned in any other place."
 
 
 [6]
 Kilbourn v. Thompson, 103 U.S. 168, 26 L. Ed. 377 (1881)
 
 
 [7]
 "But plaintiffs' witnesses could do little more than speculate as to the effect that disclosure of their contributors would have. Moreover, several contributors are said to have remained anonymous even from U.S.S. F. officials; manifest disclosure of Bank records can have little effect on their continued contributions, and future contributors can readily undertake similarly to preserve their anonymity. The showing of plaintiffs with respect to the adverse effect on contributors falls far short of establishing the requisite element of a preliminary injunction, namely, irreparable injury. Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D. C. 106, 110, 259 F.2d 921, 925 (1958). In the face of such a strong legislative (and public) interest in the investigation at issue here, plaintiffs' showing of injury to First Amendment rights is insufficient to warrant a finding of probable success at a full trial, cf. NAACP v. Alabama, supra, and coupled with the validity of the Subcommittee action, certainly is an insufficient basis for granting injunctive relief against a committee of Congress. Cf. Dombrowski v. Pfister, 380 U.S. 479 [85 S.Ct. 1116, 14 L.Ed.2d 22] (1965)
 
 
 [8]
 This proposed testimony was put into the record as a proffer, when the objection was sustained
 
 
 [9]
 This witness had for 20 years raised funds for "cause organizations", ACLU, Youth March for Integrated Schools, The Independent Socialists League, The League for Industrial Democracy, The A. Phillip Randolph Institute and others
 
 
 [10]
 On cross-examination of several plaintiffs' witnesses the government got some affirmative response to the question whether the very fact of an investigation by the Senate Committee might not result in producing some otherwise not forthcoming funds. No witness, however, varied from his testimony that the enforcement of the subpoena was and/or would be seriously damaging in the net result
 
 
 [1]
 1) To stimulate, develop, foster, coordinate, improve and encourage the educational opportunities of military personnel and to protect the civil rights of such persons, by:
 2) Holding public meetings, providing entertainment and other recreational services for the benefit of military personnel;
 3) Executing, sponsoring and encouraging research designed to improve the general welfare of military personnel;
 4) Contributing to the costs of legal representation of military personnel;
 5) Initiating programs, including scholarship programs, designed to further the educational opportunities of military personnel;
 6) Collecting, assembling, exchanging, publishing and otherwise freely disseminating (a) to military personnel and (b) to the general public, knowledge and information relating to the improvement of all aspects of military life. (A.2)
 
 
 [2]
 "[T]he thing which concerns us most is [one of] the war in Vietnam . . . ." Testimony of USSF expert witness Dale Edwin Noyd of Richmond, Indiana, an Assistant Professor of Psychology at Earlin College (A. 53, 150)
 
 
 [3]
 The resort to force to counter the disruptive activities of the USSF, while highly improper, is an indication as to how seriously many view some of the USSF activities
 
 
 [4]
 Barksy v. United States, 83 U.S.App.D.C. 127, 132, 167 F.2d 241, 246 (1948), cert. denied, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767, rehearing denied 339 U.S. 971, 70 S.Ct. 1001, 94 L.Ed. 1379
 
 
 [5]
 Mitchell v. Richardson (No. 71-1510, March 20, 1973); Massachusetts v. Laird, 451 F.2d 26 (1st Cir. 1971), aff'g 327 F. Supp. 378 (D.Mass.1971); Orlando v. Laird, 443 F.2d 1039 (2d Cir. 1971); Berk v. Laird, 317 F.Supp. 715 (E.D.N.Y.1970); United States v. Sisson, 294 F.Supp. 511 (D.Mass.1968)
 
 
 [6]
 S. Res. 341, 91st Congress, in its entirety provides:
 S. Res. 341
 Resolved, That the Committee on the Judiciary, or any duly authorized subcommittee thereof, is authorized under sections 134(a) and 136 of the Legislative Reorganization Act of 1946, as amended, and in accordance with its jurisdiction specified by rule XXV of the Standing Rules of the Senate insofar as they relate to the authority of the committee to make a complete and continuing study and investigation of (1) the administration, operation, and enforcement of the Internal Security Act of 1950, as amended; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United States, its territories and possessions, including, but not limited to, espionage, sabotage, and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force or violence.
 Sec. 2. For the purposes of this resolution, the committee, from February 1, 1970, to January 31, 1971, inclusive, is authorized (1) to make such expenditures as it deems advisable; (2) to employ upon a temporary basis technical, clerical, and other assistants and consultants: Provided, That the minority is authorized to select one person for appointment and the person so selected shall be appointed and his compensation shall be so fixed that his gross rate shall not be less by more than $2,700 than the highest gross rate paid to any other employee; and (3) with the prior consent of the heads of the departments or agencies concerned, and the Committee on Rules and Administration to utilize the reimbursable services, information, facilities, and personnel of any of the departments or agencies of the Government.
 Sec. 3. Expenses of the committee under this resolution, which shall not exceed $555,000, shall be paid from the contingent fund of the Senate upon vouchers approved by the chairman of the committee.
 
 
 [7]
 The original resolution was adopted on May 11, 1970. It referred to the "United [sic] Servicemen's Fund, Inc." On May 15, 1970 the resolution was amended to refer to the "United States Servicemen's Fund." (A. 66)
 
 
 [8]
 The Party had already disclosed all checks that it had drawn in favor of persons residing within the prosecutor's judicial district. 283 F.Supp. at 259. Thus there had been complete disclosure of "expenditures", which without further showing, was the only relevant inquiry
 
 
 [9]
 Some "checks indicated that they were drawn in payment for campaign services such as knocking on doors, ringing doorbells, and other activities to 'get out the vote' for Republican candidates." Pollard v. Roberts, 283 F.Supp. at 252. Such legitimate campaign activities are no proof of illegal vote buying
 
 
 [10]
 The right of a racial minority to be protected against oppressive conduct by government because of their attempts to protect their guaranteed civil rights weighs more heavily against governmental activity than does the right of a group to be protected against activity by government to investigate what appears to be subversive activities so as to determine legislative policy with respect to the desirability of continuing existing statutes regulating their activity and authorizing tax exemptions for organizations so engaged. Four out of the five cited cases have strong racial overtones and related to states which, while great progress has been made in this respect in recent years, were still states where racial discrimination has been a recognized national problem. The cases with regard to Alabama and Louisiana involved states where the effect of prior suppression was such that the Attorney General determined that as late as November 1, 1964 local conditions were such that they were required to clear changes in local voting procedures in accordance with section 5 of the Voting Rights Act of 1965, as amended, 30 Fed.Reg. 9897, Aug. 7, 1965; 79 Stat. 439, 42 U.S.C. Secs. 1973b(b), 1973c; cf. Petersburg v. United States, 354 F.Supp. 1021 (D.C.D.C.1972); Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). This determination, involving these well recognized local situations with respect to racial matters when coupled with the objectives sought to be accomplished by the Government in these four cases, were factors that the Supreme Court would not be oblivious to in their decision. Each of these four cases is thus also distinguishable on this basis from the facts in this case
 
 
 [11]
 General Douglas MacArthur once remarked, "In war morale is to the physical as four to one." Thus, to the extent that the USSF was striking at the morale of the troops it was striking at the jugular
 
 
 [12]
 Barksy v. United States, supra, 167 F.2d at 245
 
 
 [13]
 The federal statutes contain many provisions prohibiting certain tax exempt organizations from making political contributions, including the following: Agricultural Hall of Fame, 36 U.S.C. Sec. 980; American Legion, 36 U.S.C. Sec. 46; American War Mothers, 36 U.S.C. Sec. 98; AMVETS, 36 U.S.C. Sec. 67d; Big Brothers of America, 36 U.S.C. Sec. 890; Blinded Veterans Association, 36 U.S.C. Sec. 860; Blue Star Mothers of America, Inc. 36 U.S.C. Sec. 950; Board for Fundamental Education, 36 U.S.C. Sec. 510; Boys Clubs of America, 36 U.S.C. Sec. 700; Congressional Medal of Honor Society of the United States of America, 36 U.S.C. Sec. 800; Disabled American Veterans, 36 U.S.C. Sec. 90f; Federal Employees, 5 U.S.C. Secs. 7321, 7323; Foundation of the Federal Bar Association, 36 U.S.C. Sec. 580; Future Farmers of America, 36 U.S.C. Sec. 2280; Jewish War Veterans, U.S.A., National Memorial, Inc., 36 U.S.C. Sec. 919; Ladies of the Grand Army of the Republic, 36 U.S.C. Sec. 78i; Legion of Valor of the United States of America, Inc., 36 U.S.C. Sec. 640; Military Order of the Purple Heart of the United States of America, 36 U.S.C. Sec. 830; National Conference of State Societies, 36 U.S.C. Sec. 411; National Conference on Citizenship, 36 U.S.C. Sec. 440; National Fund for Medical Education, 36 U.S.C. Sec. 610; National Music Council, 36 U.S.C. Sec. 670; National Safety Council, 36 U.S.C. Sec. 471; National Woman's Relief Corps, Auxiliary to the Grand Army of the Republic, 36 U.S.C. Sec. 1011; Naval Sea Cadet Corps, 36 U.S.C. Sec. 1050; Reserve Officers Association, 36 U.S. C. Sec. 230; Sons of Union Veterans of the Civil War, 36 U.S.C. Sec. 541; United States Blind Veterans of the World War, 36 U.S.C. Sec. 86; Veterans of World War I of the United States of America, 36 U.S.C. Sec. 771
 
 
 [14]
 2 U.S.C. Sec. 244, and see generally, 2 U.S.C. Sec. 241, et seq., for regulation and disclosure of those associated in admittedly legitimate political activity. And it is not unknown for newspapers to be required to register the names of their owners and publishers in order to disclose to the public the names of those responsible for its statements. For example, See Minn.Stat. 331.03 (1967):
 
 
 [331]
 03 Statement of ownership. Each newspaper printed or published within the state, excepting legally qualified newspapers, shall register in the office of the register of deeds a statement of the owners, printers, and publishers of the paper and the residence of each and, if the same shall be published by a corporation, the names and residences of the president, secretary, and editors thereof. The register of deeds shall provide a suitable book in which to register the names, as herein provided, and charge therefor a fee of 50 cents
 
 
 [15]
 I would have thought that the freedom on association which is and should be entitled to constitutional protection would be promoted, not hindered, by disclosure which permits members of an organization to know with whom they are associating and affords them the opportunity to make an intelligent choice as to whether certain of their associates who are Communists should be allowed to continue their membership
 White, J., dissenting, 372 U.S. at 584, 83 S. Ct. at 913.
 
 
 [16]
 The U.S.Const. provides in Art. I, Sec. 1:
 All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.
 
 
 [17]
 The majority opinion cites Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L. Ed.2d 912 (1973), for the proposition that publication of alleged defamatory literature by individuals who were not members of Congress, or on the congressional staff of the committee producing the report, is not protected action under the Speech or Debate Clause, but such is not the principal holding of the case and that portion of the Doe decision is not relevant to this case, because we do not here have any parties who are not either committee members or staff members. What is important here is that Doe squarely held, and the opinion was unanimous on this point, that members of Congress, members of the staff of the congressional committee, its consultant and investigator were absolutely immune under the Speech or Debate Clause when they were engaged in the legislative acts of compiling the committee report setting forth voluminous facts and performing other legislative acts connected with such report. Thus, if Doe were followed, as it should be, Senator Eastland and the Senate Subcommittee staff (including Chief Counsel Sourwine) when they were gathering facts in the "legislative sphere" would be "absolutely immune" from judicial interference. Obviously members of Congress are not immune if the authorizing resolution is invalid or if it improperly "invade[s] the privacy of a citizen," but such is not this case
 
 
 [18]
 The trial court denied appellant's request for an order to compel the testimony of Sourwine, Chief Counsel of the Committee, and the majority opinion would vacate such denial in order that the trial court may reconsider this matter in light of the finding that the subpoena is invalid, void and unenforceable. The majority opinion thus does not determine whether the Senate validly exercised its privileges under the Separation of Powers Doctrine of the Constitution when it adopted S.Res. 478 on October 13, 1970, 116 Cong.Rec. 36481, authorizing the Chief Counsel of the Senate Subcommittee on Internal Security to testify in response to subject subpoena but prohibiting him from testifying except as to matters which were "of public record." (A. 73-73). The Resolution authorizes the Chief Counsel to give a deposition but provided, 116 Cong.Rec. 36481, certain limitations:
 "but [he] shall not testify respecting matters of which he obtained knowledge by virtue of his position and which are not matters of public record and shall not without further action by the Senate surrender any papers or documents on file in his office or under his control in his possession as Chief Counsel of the Senate Internal Security Subcommittee of the Committee on the Judiciary, Cong.Rec. October 13, 1970, S.Res. 478."